Filed 9/23/24  In re Julian H. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re JULIAN H., a Person Coming Under the Juvenile Court Law. | B330263 (Los Angeles County Super. Ct. No. 23CCJP00281) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>J.H.,<br><br>        Defendant and Appellant.<br><br>A.V.,<br><br>        Defendant and Respondent. | |

APPEAL from an order dismissing the dependency petition of the Superior Court of Los Angeles County, Tara L. Newman, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant J.H.

Dawyn R. Harrison, County Counsel and Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Respondent A.V.

_____

Appellant J.H., the child's presumed father, appeals from a dependency court order dismissing a Welfare and Institutions Code section 300 petition.  J.H. argues the juvenile court abused its discretion when it denied the Los Angeles County Department of Family and Children Service's (DCFS or the Department) request to continue the jurisdictional hearing because the dependency investigator (investigator) who prepared key reports failed to appear at that hearing and thus was not available for cross-examination.  The juvenile court then excluded the reports because the investigator was not available for cross-examination. We assume for purposes of this appeal the court abused its discretion in not continuing the hearing.  J.H., however, fails to identify prejudice from this assumed error.

J.H. also argues substantial evidence does not support the juvenile court's dismissal of DCFS's petition.  To succeed on this challenge, J.H. would have had to show as a matter of law, that the petition was meritorious requiring the juvenile court to exercise jurisdiction over the child.  J.H. has failed to make that showing.

2

For all these reasons, we affirm the juvenile court's order dismissing the petition.

## BACKGROUND

Mother has two children, Julian (born in 2013) and I.P. (born in 2019).  At the time DCFS filed the petition before us, J.H.'s whereabouts were unknown.  Mother reported she had lost contact with him four years earlier.  At the time the dependency proceedings commenced, mother was living with B.P., the father of I.P.  Mother worked from 4:00 p.m. to 1:00 a.m.  B.P. worked from 4:00 a.m. to 2 p.m. and then took care of Julian and I.P. when mother was at work.

1.    *The petition*

In a petition filed January 24, 2023, DCFS alleged under Welfare and Institutions Code[1] section 300, subdivision (a) that B.P. abused Julian by striking his arm and inflicting a bruise as B.P. had done in the past, and that on a prior occasion, B.P. struck Julian with a toy knife.  DCFS alleged this conduct placed Julian and I.P. at risk of "serious physical harm, damage, danger and physical abuse."[2]

---

[1] Undesignated statutory citations are to the Welfare and Institutions Code.

[2] Section 300, subdivision (a) allows a juvenile court to take jurisdiction over a child if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.  For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings,

DCFS repeated these allegations under section 300, subdivision (b)(1) and further alleged under section 300, subdivision (b)(1) that mother failed to protect Julian causing Julian and I.P. "risk of serious physical harm, damage, danger, physical abuse and failure to protect." Finally, DCFS alleged under section 300, subdivision (j) that B.P.'s abuse of Julian and mother's failure to protect Julian also placed I.P. "at risk of serious physical harm, damage, danger, physical abuse and failure to protect."

---

or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm. For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."

Subdivision (b)(1) allows a juvenile court to take jurisdiction over a child if, inter alia, the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result" of the failure of the child's parent or guardian to adequately supervise or protect the child.

Subdivision (j) allows the juvenile court to take jurisdiction over a child if the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child."

4

**2.** *The detention report and the court detains Julian and leaves him in mother's custody*

The detention report describes a history of DCFS referrals. In 2014, mother reported J.H. hit her and she was concerned he may have been smoking marijuana in Julian's presence. Mother reported she had a restraining order requiring J.H. to stay away from her. DCFS deemed the allegations inconclusive or unfounded.

Another 2014 referral claimed J.H. physically abused Julian; DCFS concluded this allegation was unfounded. In 2015, DCFS substantiated an allegation that J.H. failed to supervise Julian while Julian was in J.H.'s care and refused to cooperate with DCFS. J.H. did not participate in court ordered domestic violence and parenting classes or therapy. In 2016 and 2017, J.H. reported mother neglected Julian and mother's then boyfriend abused Julian. DCFS determined these allegations were unfounded or inconclusive.

The report described a 2022 referral regarding Julian's behavior problems at school and Julian's telling school personnel that B.P. had hit him. The report states Julian had a history of "trauma and neglect" with J.H. and Julian was in therapy. In the context of investigating the 2022 referral, mother admitted to a social worker that she and B.P. spanked Julian as discipline. DCFS substantiated the referral allegation of general neglect but did not substantiate allegations of emotional and physical abuse. DCFS closed the case after mother declined voluntary family maintenance services.

The detention report also describes social worker interviews as to the current petition. In a December 7, 2022 interview, mother said she was at work when DCFS alleged B.P.

5

was playing with Julian and had bruised him. Mother indicated Julian could have been bruised when school personnel restrained him after he ran away from staff. Mother also reported B.P. cared for Julian as if Julian were his own child. Mother told the social worker Julian was in therapy. Mother acknowledged she and B.P. physically disciplined Julian when he misbehaved.

When a social worker questioned B.P. on December 7, 2022, he admitted the allegations in the current petition. B.P. acknowledged Julian had reported being scared of B.P. but explained that on the day Julian was bruised on his arm, B.P. was trying to teach Julian how to defend himself against bullies. B.P. said he used "moderate force when punching the child in a playful manner" and Julian had his hands ready to "block" the punches. At the time they were playing, B.P. was not aware Julian had been hurt.

A social worker interviewed Julian on December 7, 2022, who reported he had not interacted with J.H. in a long time. Julian said he was "play fighting" with B.P. while mother was at work. B.P. was teaching Julian "how to fight bullies." Julian reported it hurt when B.P. punched him, but he did not tell B.P. to stop because Julian "wanted to continue playing." Julian confirmed he had a bruise on his arm. Julian also described another incident in which he played with a "play knife" with B.P. Julian said he was scared of B.P. "sometimes" but he "loved" B.P. Julian felt "safe and comfortable" living with mother and B.P.

On December 7, 2022, a social worker described Julian's bruises: "[T]he child had a 2x2 inch mark/bruising on his inner right arm. Child also had two 1x1 inch bruises by his left outer wrist and outer arm." The social worker checked I.P. and found no marks or bruises.

6

A social worker spoke to a counselor at Julian's school on December 7, 2022, who indicated Julian frequently had "meltdown[s]." The counselor stated when Julian tried to climb a fence, "staff attempted to pull" him down "by his waist." The counselor believed "mother was involved, engaged, and advocated for" Julian. Julian met with a therapist during school hours at least once a week. The counselor did not see any marks or bruises on Julian but did not look under his clothing.

At DCFS's request, B.P. moved out of the family home in approximately January 2023.

A police report attached to the detention report stated an officer interviewed Julian in November 2022 and Julian stated he felt safe at home. Julian described his play fighting with B.P., which hurt him, although Julian "[did] not believe" B.P. "was trying to hurt him" and thought it was an "accident." Julian told the officer B.P. apologized for causing the bruise. Julian also told the officer he played with B.P. with a toy knife and sometimes it was painful when B.P. "pretends to stab" Julian. The officer also interviewed B.P, who said he was trying to teach Julian how to defend himself and that he did not intend to hurt Julian. B.P. confirmed they sometimes played with a toy knife.

Based on the detention report, on February 7, 2023, the court found a prima facie case Julian was a person described by section 300. Julian was released to mother with the caveat that he could not be left alone with B.P. The court ordered services to assist Julian with his Attention Deficit Hyperactivity Disorder. The court also ordered DCFS prior to the next hearing to assess whether the court should order a program of supervision pursuant to section 301.

J.H. first appeared on April 11, 2023; the court found he was Julian's presumed father.  The court again ordered DCFS to assess whether the court should order a program of supervision pursuant to section 301.

3.    ***Additional social worker reports not admitted into evidence at the jurisdictional hearing***

A jurisdiction report dated April 2023 indicated that the children were living with mother.  DCFS had located J.H., who had enlisted in the military and was living outside of California.  According to the jurisdictional report, J.H. and mother had a 2017 family law court order awarding mother primary physical custody of Julian and J.H. was permitted regular visits on Tuesdays and every other weekend.

The report describes Julian's statement to the social worker on March 8, 2023 that Julian and B.P. were play acting so that Julian learned how to defend himself.  Julian acknowledged that B.P. had hit him " 'a little too hard on the arm.' "  Julian said, " 'We don't horseplay anymore, I wish we still did.' "  Julian also said that " 'a long time ago,' " he would " 'get smacked' " as a form of discipline.  Julian reported being " 'happy and [having] fun' " when he played with the toy knife with B.P.  Julian further reported B.P. stopped when Julian said it hurt.

Mother acknowledged on March 8, 2023 that Julian and B.P. "horseplay" but believed that Julian was safe with B.P.

When J.H. spoke to a social worker on February 23, 2023, he expressed a desire to see Julian.  J.H. stated that he had no contact with Julian for four years.

In a March 9, 2023 interview, Julian's therapist described Julian's bruise on his arm, and indicated Julian told the therapist he had received it "play fighting" with B.P.  Julian

8

never told the therapist he was afraid to go home. A school counselor indicated in a March 2023 interview, that in the previous year, Julian had expressed fear about going home and said, " '[D]addy is going to hit me.' " Julian's principal indicated that after one incident at school, Julian said he would prefer to go home with mother rather than B.P.

In its jurisdictional report filed April 11, 2023, DCFS concluded the children were safe in mother's care. DCFS stated, "At this time, the identified perpetrator is out of the home and Court ordered for the minor Julian not to be left unattended with [B.P.;] therefore[ ] the children are deemed safe in mother's care."

A last minute information report dated April 7, 2023, stated B.P. had admitted the allegations in the petition. B.P. acknowledged he had learned in therapy how to be a better parent. DCFS recommended in the report that the court sustain the petition and order family maintenance services as to mother. DCFS told the court I.P. was not at risk in B.P.'s care. DCFS reported mother and B.P. were living separately.

Another last minute information report filed May 10, 2023 indicated that in April 2023, Julian was hospitalized due to his statement that he wanted to kill himself. DCFS attached to the last minute information report filed May 10, 2023 an April 8, 2023 letter from B.P.'s clinical psychologist indicating that B.P. "is not an abusive parent." B.P. was a "devoted parent" and was "the primary caregiver as the mother elected to work afternoons and evenings 6-days a week." The therapist indicated he "never obtained any indications that would make me suspect that [B.P.] would pose a danger to Julian or [I.P.]. On the contrary, [B.P.] has demonstrated genuine unconditional regard for both the

9

children and has an authentic interest in their overall health and well-being."

4.    *Jurisdictional hearing*

The court continued the jurisdictional hearing, initially set for April 11, 2023, to May 18, 2023. At the April 11, 2023 hearing, B.P.'s counsel requested that the investigator be on call for cross-examination at the continued hearing and the juvenile court's order dated April 11, 2023 indicates the investigator who prepared the jurisdictional and subsequent reports was on call for the hearing. On May 18, 2023, the court continued the jurisdictional hearing to May 31, 2023. DCFS represented that on May 18th, the investigator who prepared the jurisdictional and subsequent reports would be present at that new date.

At the May 31st hearing, B.P.'s counsel requested the court exclude the jurisdictional and subsequent reports because the investigator was not present for cross-examination. County counsel opposed exclusion of the reports and argued for a continuance if the court were inclined to exclude the reports. B.P., who was represented by counsel, opposed the continuance request because the case had been pending since January with DCFS supervision. The court found no good cause to continue the case again. The court reasoned it would exclude the challenged reports because the investigator was not available for cross-examination. J.H. was represented by counsel at the jurisdictional hearing and did not object either to not continuing the hearing or exclusion of the reports.

Mother and B.P. testified at the jurisdictional hearing. Mother told the court she was aware of an incident in which Julian said B.P. had stabbed him with a toy knife. Mother believed the bruises were accidental because for five years, B.P.

10

was like a parent to Julian. Mother testified neither she nor B.P. used physical discipline since a prior referral in June of 2022. Julian never told mother he was afraid to be around B.P. Mother further testified she was no longer in a relationship with B.P. and had no intention of returning to him. According to mother, Julian's visits with B.P. consisted of phone calls.

B.P. was aware Julian had told the police B.P. punched Julian's right arm multiple times with a closed fist. B.P. explained the bruise was the result of B.P. trying to teach Julian how to defend himself. B.P., however, admitted he had bruised Julian in this effort.

B.P. also acknowledged he pretended to stab Julian with a toy knife on Julian's rib, buttocks, and leg causing both to laugh. B.P. said Julian had asked him for help in learning self-defense. B.P. said he wanted to show Julian how to defend himself because Julian's classmates were bullying him. B.P. testified he did not intend to harm Julian when he was play fighting with him. B.P. further testified that after speaking with a therapist, he no longer spanked Julian or play fought with him.

B.P. was aware Julian had told DCFS Julian was afraid of B.P. B.P. testified he was sad when he realized he had harmed Julian because he "thought [they] were having a good time . . . because we were laughing, and I didn't realize that it hurt him . . . ." When the court asked B.P. if the incident when he was teaching Julian self-defense was the "first time you had rough played with him," B.P. responded, "Honestly no. We've played before, but just to leave bruising—yes, where I left the bruising."

After the testimony, the children's counsel objected to the court's exclusion of the jurisdictional report. Counsel for the children indicated she "will be submitting the issue to the court

11

as to Julian." As to I.P., counsel for the children recommended dismissing I.P. from the petition.

The court struck I.P. from the petition because DCFS had not met "its burden to show that [I.P.] is at risk of serious physical harm, damage, or danger." The court then found B.P. had misunderstood the extent of the force he was using and did not intend to harm Julian. The court stated, "I do find that [B.P.] clearly was out of line with the degree of which he was striking Julian. He does indicate they have play fought before without injury to the minor. Mother gave conflicting information as to whether or not she observed bruises on Julian." "However, the allegation is specific to [B.P.] striking the minor. I don't believe that the Department has met [its] burden by preponderance of the evidence to show that [B.P.]—when he used excessive force play fighting with Julian on this one occasion, I don't believe that the Department has shown there is substantial risk that the child will suffer serious physical harm as a result. [¶] [B.P.] has engaged in services." He has indicated "he would not engage in that behavior again. [¶] Mother had no reason to reasonably know that there was abuse of Julian by" B.P.

The court dismissed the petition and granted a 14-day stay of the dismissal. After the court dismissed the petition, counsel for J.H. stated J.H. was "in agreement" with DCFS's position that the allegations should be sustained and "would object to the court dismissing the petition today."

12

## DISCUSSION[3]

### A. Assuming the Court Erred In Not Continuing the Hearing To Allow for Cross-Examination of the Jurisdictional Report Preparer, J.H. Demonstrates No Prejudice

The juvenile court excluded the jurisdictional and subsequent reports because the investigator was not available at the jurisdictional hearing for cross-examination. J.H. contends exclusion of the reports was error.[4] J.H. contends the failure to grant the continuance resulting in the exclusion of the reports was "a prejudicial mistake of law that requires a reversal of the order dismissing the dependency petition . . . ."[5]

---

[3] We assume without deciding that J.H. has standing to appeal the dismissal of a dependency petition. (E.g., *People v. Alfaro* (2007) 41 Cal.4th 1277, 1332 ["We assume, without deciding, that defendant has standing to invoke provisions of the international charters and agreements upon which she relies"]; *Padres Hacia Una Vida Mejor v. Davis* (2002) 96 Cal.App.4th 1123, 1129 ["For purposes of this decision, we assume without deciding that the County and S–K have standing to bring this appeal."].) For purposes of this appeal, we also assume J.H. did not forfeit the arguments he raises on appeal by failing to object to exclusion of the jurisdictional and last minute reports or to the court's refusal to continue the jurisdictional hearing.

[4] Section 355, subdivision (b)(2) allows admission of those reports if the preparer is available for cross-examination upon a timely request by a party.

[5] On May 2, 2024, DCFS filed a letter brief claiming it was not a proper respondent on appeal and "was aligned with the Appellant" in the juvenile court.

We review an order denying a continuance for abuse of discretion.  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 448.)  Appellant has the burden to demonstrate prejudice from the denial of a continuance.  (*Id.* at p. 449.)

Assuming arguendo the juvenile court abused its discretion in failing to grant a continuance and excluding the reports, J.H. has failed to show prejudice under any standard of prejudice.  At the jurisdictional stage, DCFS had the burden to prove the children were at risk of harm at the time of the jurisdictional hearing.  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.)  " 'To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' [Citation.]"  (*Id.* at p. 602.)  J.H. identifies *no* excluded evidence that would have assisted DCFS in meeting its burden.  He simply asserts without any record support that the court's assumed error was prejudicial and therefore requires reversal of the order dismissing the petition.  J.H. has the burden to provide cogent argument and record support; we do not make arguments for him.  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408; see *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 276–277.)  Accordingly, he has failed to show prejudice.

## B.     J.H. Does Not Show the Petition Should Have Been Sustained as a Matter of Law

To demonstrate the court erred in dismissing the petition, J.H. must show the evidence compels a finding of jurisdiction as a matter of law.  (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1147 ["Since Minors bore the burden of proof below and failed to meet it, we apply well-established rules of appellate review and

14

conclude that to prevail on appeal, Minors must show the evidence compels a finding in their favor as a matter of law."]; *id*. at p. 1163; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

J.H. does not argue that as a matter of law, the juvenile court was required to sustain the petition. Instead, he applies an incorrect standard of review, arguing that the juvenile court's order is not supported by substantial evidence. J.H. also misapplies the substantial evidence standard of review because he fails to summarize the evidence in the light most favorable to the prevailing party. (*In re I.J.* (2013) 56 Cal.4th 766, 773 [" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' "])

J.H. cannot show that the court erred as a matter of law in failing to exercise jurisdiction over Julian. The record supports the juvenile court's determination that at the time of the jurisdictional hearing, Julian was not at risk of harm because B.P.'s excessive use of force was not likely to recur. B.P. testified he had learned he should not play fight with Julian. B.P. testified he did not intend to harm Julian when they were play fighting and that he was "sad" when he learned he had hurt Julian. Further, it was undisputed that mother and B.P. were no

15

longer living together or in a relationship, thus further supporting the juvenile court's conclusion Julian was not at substantial risk of harm by the time of the jurisdictional hearing. Similarly, the parties do not dispute mother was not at home when B.P. used excessive force and that after she learned of the incident, she protected Julian by living separately from B.P. In sum, the testimony supports the juvenile court's finding that the conduct that brought Julian into the dependency court initially was not likely to recur. Accordingly, the record supports the court's dismissal of the petition.

## DISPOSITION

The juvenile court's order dismissing the dependency petition is affirmed.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

WEINGART, J.                    KLINE, J.*

---

    **\*** Retired Associate Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16